STATE OF NORTH CAROLINA v. JERRY NORMAN WARD

No. 59

(Filed 6 May 1980)

1. **Criminal Law § 57— ballistics expert—testimony that bullet "could have" been fired from defendant's pistol—reference to capability**

   An expert in ballistics and firearms was properly permitted to testify in a homicide case that the fatal bullet "could have" been fired from defendant's pistol where, considered contextually, the witness was testifying in effect that the fatal bullet, a .22 caliber slug, was capable of being discharged from defendant's .22 caliber pistol or from any other .22 caliber weapon.

2. **Criminal Law § 113.2— failure to instruct on material feature of case**

   While the trial judge is not required to instruct the jury as to evidentiary matters essentially "subordinate," *i.e.*, those which do not relate to the elements of the crime charged or to defendant's criminal responsibility, failure to instruct upon a substantive or "material" feature of the evidence and the law applicable thereto will result in reversible error even in the absence of a request for such an instruction.

3. **Criminal Law §§ 112, 113.2; Homicide § 23— failure to charge on defendant's material testimony—inadequate final mandate**

   The trial court in a second degree murder case erred in omitting any reference in the charge to defendant's testimony that he did not shoot at or near the deceased but fired his pistol away from deceased, since defendant's testimony related to a material and substantial feature of the case in that it tended to show either that he did not fire the fatal shot and was not guilty of any homicide or that, if he did fire the fatal shot, the killing was not the result of an intentional assault and he would be guilty at most of involuntary manslaughter; furthermore, such error was prejudicial to defendant when coupled with the court's further error in failing to instruct the jury in the final mandate that if the jurors were not satisfied beyond a reasonable doubt as to each

essential element of the charge of second degree murder, then it would be their duty to return a verdict of not guilty of that charge.

APPEAL by defendant from a judgment rendered by *Judge Clark* at the 20 August 1979 Criminal Session of COLUMBUS Superior Court. Defendant was charged with first degree murder, convicted of murder in the second degree, and sentenced to not less than 30 years nor more than life imprisonment.[1]

*Rufus L. Edmisten, Attorney General, by Thomas B. Wood, Assistant Attorney General, for the State.*

*D. Jack Hooks and Ray H. Walton, Attorneys for defendant appellant.*

EXUM, Justice.

Defendant's assignments of error challenge the admissibility of certain testimony offered by a ballistics expert on behalf of the state and the sufficiency of the trial court's instructions to the jury. For errors in the jury instructions, we reverse and grant a new trial.

The state's evidence tended to show that on 29 March 1979, the deceased, Joe Eddy White, was at the home of his parents watching television with his mother. White's mother testified that around 9:30 p.m. she observed the lights of a vehicle pulling into the driveway and heard a horn blow. Joe Eddy went outside to investigate. A few moments later, the mother heard a shot and ran outside to see Joe Eddy walk back towards the house and then fall down on his knees. He said, "Mother, Jerry Ward has shot me" and then collapsed. Joe Eddy died on the way to the hospital. An autopsy revealed the cause of death to be internal hemorrhage secondary to a .22 caliber gunshot wound.

---

1. Since defendant did not receive a determinate sentence of life imprisonment, this appeal should have been to the Court of Appeals. G.S. 7A-27(a) and (b); *State v. Ferrell*, 300 N.C. 157, 265 S.E. 2d 210 (1980). Rather than remand the matter for determination by the Court of Appeals, we have determined to treat defendant's appeal as a petition for determination prior to decision by the Court of Appeals. We have allowed the petition in our discretion on the ground that, otherwise, "[d]elay in final adjudication is likely to result . . . ." G.S. 7A-31(b)(3).

Law enforcement officers took defendant into custody around 11:00 p.m. at the home of his sister. They then took him to the Law Enforcement Center in Whiteville. During the trip he was upset and crying and repeatedly made such statements as, "I didn't mean to kill him. I just wanted to get him in the truck and take him down the road and beat the hell out of him."

Defendant's evidence tended to show that before the fatal incident on 29 March, the deceased had been having a relationship with defendant's wife, Ida Marie. Ida Marie had left home on 24 February. Defendant next saw her sitting in a car with Joe Eddy on the evening of 4 March. After an emotional confrontation, defendant told Joe Eddy "to just not let me see him no more" and then left with his wife. Later that evening, defendant's wife was admitted to the mental ward of a hospital in Lumberton. On the afternoon of 15 March, while defendant's wife was still in the hospital, defendant in a telephone conversation warned Joe Eddy to stay away from his wife or risk a beating. Joe Eddy responded that he would pick the time and place for any fight, to which defendant replied, "Well enough." On the evening of 29 March defendant received an anonymous telephone call from a man who told him Joe Eddy wanted to see him. Thinking that Joe Eddy wanted to fight, defendant later drove to the Whites' residence, pulled in the driveway, and blew the horn. He remained seated in the cab of his pickup truck. Joe Eddy came out of the house with his right hand in his back pocket. Some words were exchanged, and Joe Eddy jerked his right hand out of his back pocket and pointed it at defendant. Fearing that Joe Eddy was about to shoot him, defendant dove for his .22 caliber pistol lying on the floorboard of his truck and fired the pistol out the window. An instant later he heard a rifle shot fired from the direction of the house. He then saw Joe Eddy "coming by me cussing and holding his side" with his right hand placed under his left armpit. Defendant then left in the truck.

The pathologist who examined the body of the deceased testified that the fatal wound penetrated several inches below the left armpit on the left side, slightly to the rear of midline. The bullet's projectory was upwards. The bullet lodged beneath the sternum three to four inches higher than the point at which it entered the body. Defendant testified, however, that Joe Eddy had been facing him at all times up to and during the instant when defendant

fired out the window. The bullet removed from Joe Eddy's body was too deformed for a positive determination that it was in fact fired from defendant's gun.

[1] Defendant's first assignment of error relates to the trial court's admission of certain testimony by state's witness Robert Cerwin, a ballistics and firearms expert, concerning State's Exhibit No. 5, the bullet removed from the deceased's body. Cerwin was allowed to testify on direct examination as follows:

"Q. Do you have an opinion satisfactory to yourself as to whether or not State's Exhibit No. 5 could have been fired from [defendant's pistol]?

MR. HOOKS: Objection.

COURT: Overruled.

A. Yes, sir. It could have been fired. This type of bullet can be discharged from this type of firearm due to the family that it is. In other words, it is a .22 caliber bullet. And in [defendant's pistol] the bullet can be chambered or discharged with a .22 caliber cartridge which holds a .22 caliber bullet."

Upon cross-examination Mr. Cerwin stated that "State's Exhibit No. 5 is too deformed for comparison. By that I mean I could not make a comparison between that and any other bullet fired from [defendant's pistol]. It could have been fired from any weapon in the same family of weapons."

Defendant contends that the expert's answer that the fatal bullet "could have" been fired from defendant's gun amounted to no more than mere speculation and therefore was inadmissible under the rule in *Lockwood v. McCaskill*, 262 N.C. 663, 138 S.E. 2d 541 (1964). *Lockwood*, however, requires only that an expert's opinion that a particular cause "might" or "could" have produced a particular result be based upon a reasonable probability "that the result is *capable* of proceeding from the particular cause as a scientific fact . . . ." 262 N.C. at 669, 138 S.E. 2d at 545. (Emphasis supplied.) Considered contextually, witness Cerwin's testimony was to the effect that the fatal bullet, a .22 caliber slug, was *capable* of being discharged from defendant's .22 caliber pistol *or from any other .22 caliber weapon*. Although the witness

could have been allowed to express a more positive opinion, if he had had one, as to the causal relationship between defendant's gun and the bullet removed from the deceased's body, *see State v. Sparks*, 285 N.C. 631, 207 S.E. 2d 712 (1974), *death sentence vacated*, 428 U.S. 905 (1976), there was no error in the admission of his testimony that the bullet "could have" been fired from defendant's pistol. *State v. Tilley*, 292 N.C. 132, 232 S.E. 2d 433 (1977). That the testimony might have had little probative value goes to the question of its weight and sufficiency, not its admissibility. *See generally* 1 Stansbury's North Carolina Evidence § 137 n. 97 (Brandis rev. 1973 and 1979 Supplement).

Defendant next argues that the trial court erred (a) in omitting a substantial feature of defendant's case in the recapitulation of the evidence to the jury and (b) in failing to instruct the jury in the final mandate that if they were not satisfied beyond a reasonable doubt as to each essential element of the charge of second degree murder, then it would be their duty to return a verdict of not guilty of that charge. These contentions have merit.

The record reveals that portions of defendant's testimony, elicited on direct and cross-examination, described his 29 March confrontation with the deceased as follows:

"When I stopped my truck was about four or five feet in front of the back end of the porch. . . . In just a minute Joe Eddy came out of the house. . . . He was then at the left front of my truck. I was sitting in the truck. . . . He came out of the house by the right side of my truck. He came in front of my truck and came around there and stepped out to the front of it. He did not ever come up beside my truck. . . . When he raised his hand it was pointing toward me. At that time he was about 15 or 18 feet from me and was kind of northeast from me. He was over at the left front fender of my pickup. . . . I did not think that he had a pistol. . . . It didn't hit my mind until he jerked his hand. . . . He pointed his hand straight at me. . . . At that time I thought he had a pistol in his hand because of his actions. . . . I fell to my right to get out of the way of a possible bullet and I reached for the pistol. *I did not mean to point a pistol at Joe Eddy and kill him. I just shot out the window like that so I could get gone, so he wouldn't come on there to the truck. . . . I*

*pulled the pistol up in one motion and fired it out the window. . . . I shot straight out my truck. I didn't shoot in the direction of Joe Eddy White. I did not. I did not shoot in the direction of Joe Eddy White because I did not want to hit nobody. I just wanted to get out of the yard and get gone. I am not testifying that I ever pointed the pistol at Joe Eddy White. I did not see Joe Eddy White at the time I fired the pistol. . . . At the time I fired the gun Joe Eddy was about 15 feet from where I pointed the gun. . . .* I sure didn't want to kill him or anybody else. At the time he came by my truck he had his right hand under his left armpit. . . . I figured he had been hit with a rifle bullet because I heard a rifle shot." (Emphasis supplied.)

In his recapitulation of the evidence, Judge Clark failed to mention to the jury that evidence offered by the defendant tended to show that defendant did not fire the pistol in the direction of the deceased. This was a material omission.

[2] General Statute 15A-1232 (substantively the same as former G.S. 1-180) requires the trial judge to instruct the jury in such a way as to "declare and explain the law arising on the evidence." Although the judge's charge need not, and indeed should not, encompass every fragment of evidence offered by the state and defendant, it is required to "segregate the *material* facts of the case, array the facts on both sides, and apply the pertinent principles of law to each, so that the jury may decide the case according to the credibility of the witnesses and the weight of the evidence." *State v. Friddle,* 223 N.C. 258, 261, 25 S.E. 2d 751, 753 (1943). (Emphasis supplied.) Failure to instruct upon a substantive or "material" feature of the evidence and the law applicable thereto will result in reversible error, even in the absence of a request for such an instruction. *State v. Williams,* 284 N.C. 67, 199 S.E. 2d 409 (1973); *State v. Merrick,* 171 N.C. 788, 88 S.E. 501 (1916). On the other hand, the judge is not required to instruct the jury as to evidentiary matters essentially "subordinate," *i.e.,* those which do not relate to the elements of the crime charged or to defendant's criminal responsibility. See *State v. Hunt,* 283 N.C. 617, 623, 197 S.E. 2d 513, 518 (1973) and cases cited therein.

[3] In the instant case, defendant's testimony was to the effect that he fired his pistol *away from* Joe Eddy White, pointing the

gun 15 feet from where the deceased was standing. This testimony was competent evidence which, if believed by the jury, would tend to establish *either* that the bullet from defendant's gun was not the one which struck and killed Joe Eddy White, *or* that even if defendant's gun fired the fatal bullet, the killing was not the result of an intentional assault. If the bullet fired from defendant's gun did not in fact strike the deceased, defendant would not be guilty of any homicide. If, on the other hand, defendant did fire the fatal shot, but did not do so intending to shoot at, near, or in the direction of the deceased, he would be guilty at most of involuntary manslaughter. In the first instance, defendant's evidence negates the essential element of causation. In the second, his testimony negates a finding of an intentional assault, an essential element of murder and voluntary manslaughter. *See State v. Ray*, 299 N.C. 151, 158, 261 S.E. 2d 789, 794 (1980). Under either view, then, defendant's evidence clearly relates to an essential feature of the intentional homicide for which he was indicted. This evidence therefore presented a material and substantial feature of his case. The trial court erred in failing to mention it anywhere in the charge. G.S. 15A-1232; *see, e.g., State v. Williams, supra; State v. Mercer*, 275 N.C. 108, 165 S.E. 2d 328 (1969); *State v. Sherian*, 234 N.C. 30, 65 S.E. 2d 331 (1951).

This error was compounded by a further omission in the trial court's mandate with reference to second degree murder. That portion of the judge's charge read:

"I therefore instruct you that if you find from the evidence, beyond a reasonable doubt, that on or about March 29, 1979, Jerry Norman Ward intentionally and with malice and without justification or excuse shot Joe Eddy White with a .22 caliber pistol, that being a deadly weapon, thereby proximately causing Joe Eddy White's death, it would be your duty to return a verdict of guilty of second degree murder. . . ."

Judge Clark failed to complete this portion of the mandate with an instruction to the effect that if the jury did not find or had a reasonable doubt as to one or more of these facts, then it would be their duty to acquit the defendant of second degree murder. This omission was likewise error. *State v. Overman*, 257 N.C. 464, 125 S.E. 2d 920 (1962). By failing to give the converse or alter-

native view that acquittal should result if the jury were not satisfied beyond a reasonable doubt as to each and every stated element, the trial judge failed to provide even a general application of the law to the evidence raised by defendant's testimony.

We stress that our opinion today is not to be construed as imposing any new duty or burden upon the trial court beyond that traditionally required by the mandatory provisions of G.S. 15A-1232. Certainly the trial judge is not required to frame his instructions with any greater particularity than is necessary to enable the jury to understand and apply the law to the evidence bearing upon the elements of the crime charged. *State v. Spratt*, 265 N.C. 524, 144 S.E. 2d 569 (1965). *See, e.g., State v. Williams*, 235 N.C. 752, 71 S.E. 2d 138 (1952); *State v. Jackson*, 36 N.C. App. 126, 242 S.E. 2d 891, *cert. denied*, 295 N.C. 470, 246 S.E. 2d 11 (1978). In the instant case, however, the omission of any reference in the charge to defendant's statement that he did not shoot at or near the deceased, *coupled with* the omission in the mandate referred to above, combined to deprive defendant of the full benefit of his testimony. There must, therefore, be a

New trial.